Debra E. Schreck (NJ ID 042122006)
Marcus A. Asner*
Benjamin Wolverton*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY  10019-9710
(212) 836-8000
debra.schreck@arnoldporter.com
marcus.asner@arnoldporter.com
benjamin.wolverton@arnoldporter.com

*Pro hac vice application to be filed

Attorneys for Applicant LAE Technologies Hong Kong Ltd.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

In re:  Application of LAE TECHNOLOGIES
HONG KONG LIMITED for an Order
pursuant to 28 U.S.C. § 1782 Granting Leave
to Obtain Discovery for Use in a Foreign
Proceeding

Civil Action No. _____

## MEMORANDUM OF LAW IN SUPPORT OF
## *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO
## 28 U.S.C. § 1782 GRANTING LEAVE TO OBTAIN
## DISCOVERY FOR USE IN A FOREIGN PROCEEDING

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ............................................................................................................2

    The OTC Agreement and Deterioration of Relationship ...................................................4

    RemX Attempts to Muddy the Waters.........................................................................5

    Demuren's Role as a Key Witness...............................................................................7

    Procedural History .................................................................................................9

ARGUMENT ...............................................................................................................10

I.     This Application Meets Section 1782's Statutory Requirements ....................................11

II.    The *Intel* Factors Favor Allowing LAE To Obtain Discovery from Mr. Demuren..........13

CONCLUSION..............................................................................................................19

## **TABLE OF AUTHORITIES**

**Cases**                                                              **Page(s)**

*Advanced Micro Devices, Inc. v. Intel Corp.*,
    292 F.3d 664 (9th Cir. 2002) ........................................................................... *passim*

*Chevron Corp. v. Snaider*,
    78 F. Supp. 3d 1327 (D. Colo. 2015) ...................................................................18

*Ecuadorian Plaintiffs v. Chevron Corp.*,
    619 F.3d 373 (5th Cir. 2010) ...............................................................................14

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d. Cir. 1995)................................................................................16

*In re Bayer AG*,
    146 F.3d 188 (3d Cir. 1998).................................................................10, 13, 14, 16

*In re Biomet Orthopaedics Switzerland GmbH*,
    742 F. App'x 690 (3d Cir. 2018) .........................................................................11

*In re Blue Oil Trading Ltd.*,
    No. 09-MC-153, 2009 WL 3353293 (W.D.N.C. Oct. 15, 2009)...........................19

*In re California State Teachers' Ret. Sys.*,
    No. CV 16-4251 (SRC), 2017 WL 1246349 (D.N.J. Apr. 3, 2017) .................16, 17

*In re Chevron Corp.*,
    No. 7:10-MC-00067, 2010 WL 4883111 (W.D. Va. Nov. 24, 2010)....................18

*In re Ex Parte Glob. Energy Horizons Corp.*,
    647 F. App'x 83 (3d Cir. 2016) ...........................................................................17

*In re Gemeinschaftspraxis Dr. Med. Schottdorf*,
    No. M19-88 (BSJ), 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006) .................16, 17

*In re Guy*,
    No. M 19-96, 2004 WL 1857580 (S.D.N.Y. Aug. 19, 2004) ................................19

*In re Imanagement Servs. Ltd.*,
    No. CIV.A. 05-2311(JAG), 2006 WL 547949 (D.N.J. Mar. 3, 2006)..............12, 15

*In re Imanagement Servs., Ltd.*,
    No. MISC 0589FB, 2005 WL 1959702 (E.D.N.Y. Aug. 16, 2005) .......................16

*In re Malev Hungarian Airlines*,
   964 F.2d 97 (2d Cir. 1992)................................................................................10

*In re Microsoft Corp.*,
   428 F. Supp. 2d 188 (S.D.N.Y. 2006)..............................................................16

*In re Minatec Finance S.A.R.L.*,
   No. 1:08-CV-169, 2008 WL 3884374 (N.D.N.Y. Aug. 18 2008)......................17

*In re Oxus Gold PLC*,
   No. MISC. 06-82, 2006 WL 2927615 (D.N.J. Oct. 11, 2006)...........................10

*In re Oxus Gold PLC*,
   No. MISC 06-82-GEB, 2007 WL 1037387 (D.N.J. Apr. 2, 2007)..............11, 17

*In re Servicio Pan Americano de Proteccion*,
   354 F. Supp. 2d 269 (S.D.N.Y. 2004)..............................................................12

*In re Third Eye Cap. Corp.*,
   No. CV 22-963 (MAH), 2022 WL 714758 (D.N.J. Mar. 10, 2022)...................12

*In re Zhao*,
   No. 22-MC-195 (LAK)(KHP), 2022 WL 4547456 (S.D.N.Y. Sept. 29, 2022).....15

*IPCom GMBH & Co. KG v. Apple Inc.*,
   61 F. Supp. 3d 919 (N.D. Cal. 2014)................................................................12

*Kulzer v. Esschem, Inc.*,
   390 F. App'x 88 (3d Cir. 2010)........................................................................11

*LAE Technologies Hong Kong Limited v. RemX Limited*,
   [2021].................................................................................................................2

*Mak v. For Issuance of Discovery in Aid of Foreign Proceeding Pursuant to 28 U.S.C. 1782*,
   No. C 12-80118 SI, 2012 WL 2906761 (N.D. Cal. July 16, 2012)..................15

*Matter of HES (Caribbean) Int'l Holdings, S.R.L.*,
   No. CV20506CCCESK, 2020 WL 728892 (D.N.J. Feb. 13, 2020)...................13

*RemX Limited v. LAE Technologies Hong Kong Limited*
   [2021].................................................................................................................2

## Statutes

28 U.S.C. § 1782.............................................................................................. *passim*

28 U.S.C. § 1782(a) .....................................................................................10, 14

Petitioner LAE Technologies Hong Kong Ltd. ("LAE") submits this memorandum of law in support of its application for an Order, pursuant to 28 U.S.C. § 1782, to conduct discovery for use in civil proceedings currently pending in Hong Kong.

## PRELIMINARY STATEMENT

Through this application, LAE requests discovery in aid of two proceedings pending before the Hong Kong Court of First Instance between LAE, a Hong Kong-based technology company, and RemX Ltd. ("RemX"), a Kenya-incorporated company that facilitates cross-border money transfers.  LAE seeks evidence in this district to support its efforts in Hong Kong to enforce its contractual rights to payment in the amount of $88 USD million under an agreement by which RemX retained LAE to develop, maintain, and resell a custom stable coin cryptocurrency for RemX's exclusive use throughout Kenya and Nigeria—an agreement under which RemX has paid only $12 million of the $100 million USD it agreed to pay.  LAE also seeks evidence to defend against RemX's efforts in Hong Kong to claw back that same $12 million, which RemX claims was paid pursuant to a different, rescinded, agreement under which LAE was to purchase bitcoin on RemX's behalf.  The parties' dispute centers on whether the stable coin contract negotiated by the parties and under which RemX remitted its $12 million payment was intended to be valid and enforceable or was merely a sham:  while LAE claims the benefit of its bargain and compensation for work performed under what it asserts is a valid commercial agreement, RemX contends that the contract was merely a "dummy agreement" intended to dupe financial institutions into applying less scrutiny to RemX's funds transfers, and that the $12 million payment from RemX should be returned.

LAE seeks discovery from Olubukunmi Olufemi Demuren, the part-owner, director, and Chief Executive Officer ("CEO") of RemX—and a resident of this district.  While Mr. Demuren has not submitted evidence in the Hong Kong proceedings, to which he is not a party, he is a key

witness to the facts disputed in those litigations, including the circumstances of RemX's $12 million payment and the negotiations culminating in the execution of both disputed contracts. The evidentiary record in the Hong Kong proceedings will be incomplete without the deposition testimony of, and relevant documents from, this key witness.

LAE respectfully submits that its application satisfies the statutory requirements that allow this Court to grant an application under 28 U.S.C. § 1782, and that the circumstances here warrant the Court exercising its discretion to do so. Accordingly, LAE respectfully requests that the Court endorse the Proposed Order, submitted as Exhibit B to the Ex Parte Application For An Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery in a Foreign Proceeding, authorizing LAE to serve on Mr. Demuren the subpoena submitted as Exhibit A to the same.

## BACKGROUND

The parties' civil litigations in Hong Kong—*LAE Technologies Hong Kong Limited v. RemX Limited*, [2021] H.K.S.A.R. (H.C.A. 346/2021) and *RemX Limited v. LAE Technologies Hong Kong Limited* [2021] H.K.S.A.R. (H.C.A. 361/2021) (together, the "Hong Kong Actions")—both center on whether RemX's $12 million payment to LAE was made pursuant to a valid and enforceable agreement for the development of exclusive, stable coin technology by LAE in exchange for payment of $100 million by RemX, or instead under a separate agreement between RemX and LAE for the latter to facilitate the purchase of bitcoin by RemX. While the parties executed both contracts in November 2020, the origins of the parties' stable coin contract, titled the Value Added-Reseller Agreement (the "VAR"), began much earlier. Declaration of Alfred Wu ("Wu Decl.") Ex. 3, at 11 (First Affidavit of Aziz Leonardo Ezequiel Gammar ¶ 33) ("First Gammar Aff."). The parties first discussed LAE's development of an exclusive stable coin for RemX around March 2020, a few months after two representatives of a RemX-affiliated

company (Forth Strategies Consulting Ltd.) approached LAE's founder, Leonardo Gammar, at a November 2019 blockchain conference at which Mr. Gammar was presenting on the capabilities of LAE's blockchain-related software.  *Id.*; Wu Decl. Ex. 3, at 42 (Affidavit of Eghosa Nehikhare ¶¶ 18-19) ("Nehikhare Aff.").  Notably, Mr. Gammar's presentation did not feature any discussion of LAE's capabilities as a purchaser or distributor of bitcoin.  Wu Decl. Ex. 3, at 67 (Affidavit of Abasam Michael Onyia ¶ 7) ("Onyia Aff.").  It was through Forth Strategies Consulting Ltd. that LAE was introduced to Venture Garden Group ("VGG"), another affiliate of RemX, and then, ultimately, to RemX.  Wu Decl. Ex. 3, at 42 (Nehikhare Aff. ¶ 19).[1]

LAE and RemX began discussing the development of an exclusive stable coin technology during conference calls and emails in March 2020.  Wu Decl. Ex. 3, at 11 (First Gammar Aff. ¶ 33).  At the time, RemX, as a money transmitter, was seeking stable coin technology of its own that it could use to facilitate cross-border transactions with banks outside of Kenya.  LAE possessed the capability to develop such technology for RemX and, after months of negotiation, software demonstrations, and other work performed in reliance on the VAR's execution, the parties signed the VAR on November 14, 2020.  Wu Decl. Ex. 3, at 17-18 (First Gammar Aff. ¶¶ 61-62); Wu Decl. ¶ 5.  Per the terms of the VAR, RemX agreed to pay LAE $100 million in eight installments, due between October 2020 and January 2021.  On November 24, 2020, RemX wired LAE a $12 million USD payment to satisfy the first, second, and part of the third installments of its payments due under the VAR.  *Id.*  Notwithstanding LAE's work on RemX's behalf both before and following the parties' execution of the VAR—including its provision of software demonstrations and tailoring its custom stable coin technology for RemX's stated

---

[1] RemX and VGG, a Nigerian financial technology company, are deeply intertwined: the two companies share advisors and leadership; in particular, Mr. Demuren, owner, director, and CEO of RemX, is also a founding partner of VGG.  Wu Decl. Ex. 1, at 154.

needs—RemX has to date made no further payments to LAE.  Wu Decl. Ex. 3, at 5 (First

Gammar Aff. ¶ 10); Wu Decl. ¶ 5.

**The OTC Agreement and Deterioration of Relationship**

In October 2020, after several months of negotiations related to an agreement to develop

stable coin technology, and only one month before the parties' execution of the VAR, RemX

proposed another potential business opportunity for the parties:  LAE facilitating RemX's

purchase of bitcoin.  Wu Decl. Ex. 3, at 83 (Second Affidavit of Aziz Leonardo Ezequiel

Gammar ¶ 27) ("Second Gammar Aff.").  Indeed, only a few days before the VAR was signed,

RemX explained in WhatsApp messages to LAE that it was seeking an alternative means of

purchasing bitcoin to Binance US, the American cryptocurrency exchange RemX had previously

used to purchase bitcoin.  *Id.*  In connection with discussions about a separate agreement to

facilitate the purchase of bitcoin, RemX explained to LAE that Binance US imposed a trading

cap and charged a one percent fee against all trades, and that RemX therefore was looking for an

alternative way to execute such trades.  Wu Decl. Ex. 3, at 44 (Nehikhare Aff. ¶ 32).  Because

LAE's VAR with RemX was already on track to be executed, addressed a different subject

matter than the purchase of bitcoin, and would be governed by a separate payment structure, the

parties executed a separate agreement related to bitcoin purchasing, the Coin Management

Custody Agreement (the "Over-The-Counter Agreement" or the "OTC") after less than two

weeks of discussion.  Wu Decl. Ex. 3, at 17 (First Gammar Aff. ¶¶ 59-60).

The parties' prospects of doing business under the OTC, however, soon came to a halt.

Wu Decl. Ex. 3, at 26 (First Gammar Aff. ¶ 79).  Despite repeated efforts by LAE, RemX wholly

refused to comply with basic anti-money laundering ("AML") and know-your-customer

("KYC") due diligence that LAE attempted to conduct on RemX, and after LAE's multiple

requests for information about RemX's source of funds in November and December 2020 were

rebuffed, LAE was left with no option but to terminate the OTC.  Wu Decl. Ex. 3, at 23 (First Gammar Aff. ¶¶ 24, 76, 79); Wu Decl. Ex. 3, at 49 (Nehikhare Aff. ¶ 53).  Following this decision, which LAE communicated to RemX via WhatsApp, RemX began asserting for the first time that the $12 million payment it had made to LAE pursuant to the VAR had actually been made for the purchase of bitcoin under the OTC, and demanded that LAE return the payment if it was unwilling to participate in RemX's bitcoin business.  Wu Decl. Ex. 3, at 96 (Second Gammar Aff. ¶ 70).  RemX alleges in the Hong Kong Actions that the parties intended that only the OTC to purchase bitcoin, negotiated and executed in a matter of weeks, would be enforceable, while the long-negotiated VAR was meant to be merely a "dummy agreement"—an agreement with no legal force or effect designed solely to disguise RemX's payments to LAE as reputable business activity when scrutinized by banks.  Wu Decl. Ex. 3, at 46 (Nehikhare Aff. ¶ 40).

**RemX Attempts to Muddy the Waters**

LAE vigorously denies that the VAR was ever designed to be unenforceable, let alone that it was intended to dupe banks into authorizing transfers of funds under false pretenses.  Wu Decl. Ex. 3, at 5 (First Gammar Aff. ¶ 11).  But RemX describes such a purported scheme in its filings in the Hong Kong proceedings.  Wu Decl. Ex. 3, at 46 (Nehikhare Aff. ¶ 40) ("The VAR would be the first dummy agreement to be presented to the bank if the bank asked for supporting documentation of the purpose of the transfer.").  Moreover, RemX has alleged in the Hong Kong Actions that the standard KYC and AML due diligence that LAE attempted to conduct on RemX before purchasing bitcoin on its behalf was unwarranted and a means by which LAE was "trying to defraud RemX"—a plan to scuttle the OTC by demanding unreasonable levels of assurance that no financial institution would legitimately require.  Wu Decl. Ex. 3, at 70 (Onyia Aff. ¶ 24); Wu Decl. Ex. 3, at 24-25 (Nehikhare Aff. ¶¶ 98-102).  RemX accuses LAE of acting like "the

5

bank's compliance team" when LAE inquired about RemX's source of funds, a standard

KYC/AML consideration, and rebuffed LAE's repeated attempts to ascertain the nature of

RemX's bitcoin purchasing needs and identities and sources of funds for the clients on whose

behalf RemX presumably sought to purchase bitcoin.  Wu Decl. Ex. 3, at 50 (Nehikhare Aff. ¶

56); Wu Decl. Ex. 3, at 95 (Second Gammar Aff. ¶ 67).

RemX has insisted repeatedly, both in its Hong Kong filings and in communications with

LAE, that its reliance on "dummy agreements" and other mechanisms of avoiding "probing

questions" by banks is standard commercial activity and that LAE's required AML and KYC

procedures were unreasonable and concocted. Wu Decl. Ex. 3, at 27-28 (First Gammar Aff. ¶

67); Wu Decl. Ex. 3, at 45 (Nehikhare Aff. ¶ 36).  Rather than undermining the validity of LAE's

attempts to conduct due diligence on RemX, however, RemX's allegations in fact show why

such due diligence was warranted.  Indeed, RemX asserts in the Hong Kong Actions that it is a

legitimate business practice to provide "dummy agreements" to financial institutions to facilitate

cross-border transactions.  Wu Decl. Ex. 3, at 45 (Nehikhare Aff. ¶¶ 35-38).  Eghosa Nehikhare,

RemX's Chief Operations Officer ("COO"), in his affidavit submitted in the Hong Kong

Actions, describes how dummy agreements function and how they can be used to benefit RemX.

Wu Decl. Ex. 3, at 1, 10 (Nehikhare Aff. ¶¶ 1, 35-36).

RemX's conduct during the final stages of the parties' negotiations likewise validates

LAE's later insistence that RemX comply with reasonable KYC and AML due diligence before

the OTC could become operable.  Indeed, on October 9, 2020, RemX sought LAE's assistance in

procuring a "dummy agreement" to open a sub-account in RemX's name with Legacy Trust

Company Ltd., an institution at which LAE maintains an account and receives funds, and

described how RemX often aimed to simplify cross-border transfers of funds by making the

beneficiary name on an outgoing wire transfer appear to be the same entity as the receiving

party, creating the false impression of what it termed a "Same Company Funds Transfer." *See*

Wu Decl. Ex. 3, at 27-28 (First Gammar Aff. ¶¶ 82-83, 87); Wu Decl. Ex. 3, at 83-84 (Second

Gammar Aff. ¶ 28); Wu Decl. Ex. 3, at 44 (Nehikhare Aff. ¶ 33).  Ultimately, RemX's proposed

"dummy agreement" with Legacy Trust Company Ltd. was never executed, and at no point was

LAE a party to any "dummy agreement."  Wu Decl. Ex. 3, at 27-28 (First Gammar Aff. ¶¶ 91-

92).

**Demuren's Role as a Key Witness**

Mr. Demuren is a key witness to the above facts with relevant evidence for use in the

Hong Kong Actions, but he has submitted no affidavits or evidence in those proceedings.  Wu

Decl. ¶ 9.  While not a party himself to the Hong Kong Actions, he is the co-owner, director, and

CEO of RemX, a litigant in both proceedings.[2]  Wu Decl. ¶ 8.  Mr. Demuren was also involved

in many events at issue in the Hong Kong Actions, from the initial stages of the parties'

relationship to its deterioration.  Wu Decl. ¶ 8.

Indeed, from April 14, 2020, through July 3, 2020, the time period during which the VAR

was negotiated, Mr. Demuren was involved in several communications regarding those

negotiations.  For example, Mr. Demuren was copied on an email chain (titled "Re: Agora Stable

Coin for African Banks") in which the parties discussed RemX's intention to create an exclusive

stable coin technology and to enter into what would later become the VAR.  Wu Decl. Ex. 1, at

13-21.  The final exchange in this chain culminated in a detailed list of considerations to be taken

into account for the stable coin end product, followed by a Zoom meeting invitation where those

---

[2] Upon information and belief, Mr. Demuren is also affiliated with other RemX-related
companies with which LAE interacted in its early dealings with RemX, including Multigate
Limited, Boltpay, and Venture Garden Group.  Wu Decl. ¶ 8.

considerations were presumably to be discussed by the invitees (including Mr. Demuren).  Wu Decl. Ex. 1, at 13-14.  At that point, RemX had already begun "confidential discussions with the Executive Management Team" of one of its "partner banks" to discuss how this custom stable coin technology would operate.  *Id.*  This is not the only instance of Mr. Demuren's involvement in executive calls regarding the LAE-RemX relationship:  on February 2, 2021, Mr. Nehikhare sent Mr. Gammar a WhatsApp message, writing:  "[Mr. Demuren] and Bunmi [Akinyemiju, CEO of VGG and a RemX advisor] will like us all to have an executive call between ourselves. Man-to-man call between ourselves.  When's a good time for you?"  Wu Decl. Ex. 1, at 133.

Mr. Demuren was also involved in the disputed payment and the deterioration of the parties' relationship.  On the $12 million "Confirmation of Funds Transfer"—the document confirming the transfer of funds at the heart of this dispute—there are only two names listed at the bottom:  One is "Eghosa Nehikhare, COO," who has provided evidence for the Hong Kong Actions; the other is "Kunmi Demuren, CEO," who is not within the Hong Kong courts' jurisdiction and has not provided any evidence.  *See* Wu Decl. Ex. 1, at 77.  LAE's "Letter to Cease and Desist," through which LAE attempted to amicably resolve the dispute through confidential mediation and arbitration, is likewise addressed only to Mr. Demuren and Mr. Nehikhare.  Wu Decl. Ex. 1, at 136.

Throughout the entirety of the LAE-RemX relationship, there have been two key RemX players involved in every aspect of the planning, development, and deterioration of that relationship:  Mr. Nehikhare and Mr. Demuren.  Without Mr. Demuren's production of documents and testimony, there would be a critical gap in the evidentiary record in the Hong Kong Actions.

**Procedural History**

On March 4, 2021, LAE filed the First Hong Kong Action in the High Court of Hong Kong ("High Court") against RemX.  Wu Decl. ¶ 12.  On March 9, 2021, having already been served a writ of summons for the First Hong Kong Action, RemX filed its own, Second Hong Kong Action, in the High Court against LAE (rather than asserting counterclaims in LAE's already-pending action).  Wu Decl. ¶ 13.  On December 16, 2021, LAE filed for summary judgment against RemX on the basis that RemX had no valid defense in the First Hong Kong Action.  Wu Decl. ¶ 16.  On March 28, 2022, LAE's summary judgment application was heard before the High Court, which held that the factual matrix of the case was too complex to warrant summary judgment, and denied LAE's application.  Wu Decl. ¶ 20.  On April 12, 2022, LAE filed a Notice of Appeal against the High Court's March 28, 2022 decision, and the court, on April 22, ordered that both Hong Kong Actions be adjourned pending the determination of the appeal.  Wu Decl. ¶ 21.  A date for the appeal hearing has not yet been set.  *Id.*  In the event that the High Court's March 28, 2022 decision is upheld on appeal, the Hong Kong Actions will proceed to trial.  *Id.*

In light of the above-pending Hong Kong Actions, LAE brings this application under 28 U.S.C. § 1782 to obtain evidence from Mr. Demuren for use to enforce its rights and defend against RemX's allegations in the Hong Kong Actions.  Specifically, LAE seeks documents and testimony from Mr. Demuren concerning communications with LAE, related agreements and actual and proposed business activity, the appropriateness of LAE's efforts to conduct due diligence on RemX, and documents sufficient to identify connections between RemX and potentially related business entities.  *See* Subpoena.  Mr. Demuren possesses evidence invaluable to a fair resolution of the Hong Kong Actions.  *Id.*; Wu Decl. ¶¶ 8, 11.

**ARGUMENT**

The goal of Section 1782 is to help "foreign and international tribunals and litigants . . .

obtain[] oral and documentary evidence in the United States."  *In re Bayer AG*, 146 F.3d 188,

189 (3d Cir. 1998).  Under Section 1782, a party with an interest in a foreign legal proceeding

may apply to a U.S. district court for discovery from a person found within that district.  Section

1782 provides:

> The district court of the district in which a person resides or is found may order
> him to give his testimony or statement or to produce a document or other thing for
> use in a proceeding in a foreign or international tribunal, including criminal
> investigations conducted before formal accusation. The order may be made . . .
> upon the application of any interested person and may direct that the testimony or
> statement be given, or the document or other thing be produced, before a person
> appointed by the court.

28 U.S.C. § 1782(a).

To obtain discovery pursuant to Section 1782, an applicant must satisfy three statutory

conditions:  "(1) the party from whom discovery is sought resides or is found in the District, (2)

the discovery sought is for use in a foreign or international tribunal, and (3) the party seeking

discovery is an interested person."  *In re Oxus Gold PLC*, No. MISC. 06-82, 2006 WL 2927615,

at *4 (D.N.J. Oct. 11, 2006).  Once these statutory requirements are met, district courts should be

liberal in exercising their discretion to grant the requested discovery.  *See, e.g.*, *Advanced Micro

Devices, Inc. v. Intel Corp.*, 292 F.3d 664, 669 (9th Cir. 2002), *aff'd*, 542 U.S. 241 (2004)

("[A]llowance of liberal discovery seems entirely consistent with the twin aims of Section 1782:

providing efficient assistance to participants in international litigation and encouraging foreign

countries by example to provide similar assistance to our courts.") (citing *In re Malev Hungarian

Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)); *Kulzer v. Esschem, Inc.*, 390 F. App'x 88, 92 (3d Cir.

2010) (describing "courts' consistently liberal interpretation of the statute and its objective 'to

assist foreign tribunals in obtaining relevant information that the tribunals may find useful but,

for reasons having no bearing on international comity, they cannot obtain under their own laws'"); *In re Biomet Orthopaedics Switzerland GmBh*, 742 F. App'x 690, 695 (3d Cir. 2018) (explaining that Section 1782's statutory requirements are "modest prima facie elements") (citations omitted).  In exercising that discretion, district courts should also consider the following "*Intel* Factors":  (a) whether the discovery sought is outside the foreign tribunal's jurisdictional reach; (b) whether the nature or character of the foreign tribunal and proceeding indicate that the foreign government may not be receptive to U.S. discovery; (c) whether the applicant appears to be attempting to circumvent foreign discovery limits; and (d) whether granting the requested discovery would be "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 245.

As set forth below, LAE's Section 1782 application meets the statutory requirements, and the *Intel* Factors strongly favor approval of LAE's application to obtain discovery from Mr. Demuren.

## I.      This Application Meets Section 1782's Statutory Requirements

First, Mr. Demuren is found in this district.  Upon information and belief, Mr. Demuren presently maintains a residence at 8 Heritage Court, Somerville, New Jersey 08876.  Wu Decl. ¶ 4; *see In re Oxus Gold PLC*, No. MISC 06-82-GEB, 2007 WL 1037387, at *3 (D.N.J. Apr. 2, 2007) (respondent was "found" in the district of New Jersey in part because he "lease[d] a residential apartment in New Jersey in which he resides at least two months each year," and "has owned for more than 23 years a separate residential property in New Jersey").

Second, LAE seeks the requested discovery for use as evidence in litigations pending before the Hong Kong Court.  A copy of the statements of claim in the Hong Kong Actions are attached to the Wu Declaration as Exhibits 1 and 2.  LAE intends to use the evidence it seeks by this application to help prove its claims against RemX, and also defend against RemX's claims in

the Hong Kong Actions.  Wu Decl. ¶ 6; *see also In re Imanagement Servs. Ltd.*, No. CIV.A. 05-2311(JAG), 2006 WL 547949, at *3 (D.N.J. Mar. 3, 2006) (to satisfy the "for use" requirement, "it is sufficient that the applicant intend to offer the evidence to a foreign court"); *In re Third Eye Cap. Corp.*, No. CV 22-963 (MAH), 2022 WL 714758, at *3 (D.N.J. Mar. 10, 2022) ("Discovery sought may be considered 'for use' in a foreign proceeding if it will be employed with some advantage or serve some use in the proceeding.") (internal quotations and citations omitted). That the Hong Kong Actions are presently stayed pending resolution of the appeal of the Hong Kong court's denial of summary judgment does not change the fact that the discovery is being sought for use by LAE to aid in its assertion of claims and defenses in the Hong Kong Actions. *See, e.g.*, *IPCom GMBH & Co. KG v. Apple Inc.*, 61 F. Supp. 3d 919, 924 (N.D. Cal. 2014) (permitting discovery for use in a German proceeding even where the German litigation was on appeal, despite the respondent's argument that the "odds" that the German appeals court would reverse and consider the issue as to which discovery was sought were "vanishingly small"); *In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 273–74 (S.D.N.Y. 2004) (finding "no reason for this Court to delay" in granting application for discovery in aid of foreign litigation then on appeal following foreign court dismissal of the proceeding).  Moreover, in the event that LAE discovers new pertinent evidence from Mr. Demuren through this application, it can apply for leave from the Hong Kong court to introduce such evidence in the appeal, if certain conditions are met.  *See* Wu Decl. ¶ 22.

Third, LAE, the party seeking this discovery, is both a plaintiff and a defendant in the Hong Kong Actions and is thus certainly an interested party for purposes of Section 1782.  Wu Decl. Ex. 1 & 2; *Intel*, 542 U.S. at 256 ("No doubt litigants are included among . . . the 'interested person[s]' who may invoke § 1782[.]")); *accord Matter of HES (Caribbean) Int'l*

*Holdings, S.R.L.*, No. CV20506CCCESK, 2020 WL 728892, at *2 (D.N.J. Feb. 13, 2020) (same).

Accordingly, this application satisfies all of Section 1782's statutory requirements.  The Court should therefore examine the *Intel* Factors next, which strongly favor the grant of LAE's Section 1782 application for discovery from Mr. Demuren.

## II.        The *Intel* Factors Favor Allowing LAE To Obtain Discovery from Mr. Demuren

When an applicant has met the Section 1782 statutory requirements, "district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application."  *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).  Under Supreme Court guidance, the four factors for district courts to consider when evaluating a Section 1782 application are:  (a)  whether the discovery sought is outside the foreign tribunal's jurisdictional reach; (b) whether the nature or character of the foreign tribunal and proceeding indicate that the foreign government may not be receptive to U.S. discovery; (c) whether the applicant appears to be attempting to circumvent foreign discovery limits; and (d) whether granting the requested discovery would be "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 264–65.  As set forth below, each of these four Factors favors allowance of this application under Section 1782.

Under the first *Intel* Factor, U.S. court assistance is most appropriate where the person or entity from which discovery is sought is not within the jurisdiction of the foreign court.  *See id.* at 264 ("[N]onparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid.").  As set forth above, Mr. Demuren is, upon information and belief, a resident of this district.  Wu Decl. ¶ 4.  Given his residence here, Mr. Demuren is beyond the jurisdictional reach of the Hong Kong court, and it is unlikely that he could otherwise be

13

required to provide evidence in the Hong Kong Actions.  *See* Wu Decl. ¶ 9 ("[Mr. Demuren] does not reside in Hong Kong and is outside the jurisdiction of the Hong Kong courts for purposes of discovery.  Even if the Hong Kong court did have jurisdiction over Mr. Demuren, it is unlikely that the Hong Kong court could compel Mr. Demuren to comply with an order to produce documents or to give testimony if he chooses not to do so . . .")

Under the second *Intel* Factor, a foreign tribunal's "receptivity" is not a question of whether a particular foreign tribunal would permit discovery in a given proceeding but how a "foreign legal system . . . might respond to a § 1782 assistance from a United States court."  *In re Bayer*, 146 F.3d at 193 (a "requirement that the materials sought be discoverable in the foreign jurisdiction would be inconsistent with both the letter and spirit of the statute").  The party opposing Section 1782 discovery bears the burden of affirmatively establishing that the foreign tribunal would be *unreceptive* to the discovery.  *Id.* at 196 (the party opposing the application has "the burden of demonstrating offense to the foreign jurisdiction, or any other facts warranting the denial of a particular application").  Only a "clear directive" from the foreign legal system that it would reject evidence produced in the United States can demonstrate that the foreign tribunal is unreceptive.  *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 377 (5th Cir. 2010); *see also In re Application of Imanagement Servs. Ltd.*, 2006 WL 547949, at *4 (D.N.J. Mar. 3, 2006) ("When analyzing this consideration, courts have determined that there was a lack of receptivity only by affirmative evidence, such as evidence showing that the foreign jurisdiction rejected outright federal judicial assistance from the United States.").

All indications are that the Hong Kong courts would readily accept relevant evidence obtained through this Section 1782 application.  As set forth in the Wu Declaration, "Hong Kong courts are receptive to judicial assistance from US courts so long as the evidence is obtained

through legal means and is probative of issues in the Hong Kong case."  Wu Decl. ¶ 10.

Moreover, several U.S. District Courts have granted Section 1782 applications allowing

discovery for use in the Hong Kong Court of First Instance, the same court in which the Hong

Kong Actions are pending.  *See, e.g.*, *In re Zhao*, No. 22-MC-195 (LAK)(KHP), 2022 WL

4547456 (S.D.N.Y. Sept. 29, 2022) (granting Section 1782 petition from CEO of Binance for

documents from Bloomberg L.P. and Bloomberg Inc. in aid of Hong Kong defamation action);

*Mak v. For Issuance of Discovery in Aid of Foreign Proceeding Pursuant to 28 U.S.C. 1782*, No.

C 12-80118 SI, 2012 WL 2906761, at *1–2 (N.D. Cal. July 16, 2012) (allowing deposition in aid

of Hong Kong divorce proceeding, per Section 1782 petition, and also holding that whether the

deposition would be admissible in Hong Kong's Courts was "not an issue in the instant request

for discovery"); *see also* Wu Decl. ¶ 10 ("Hong Kong courts have in fact accepted 28 U.S.C. §

1782 assistance in the past.").  As such, this factor also favors granting LAE's Section 1782

application.

Under the third *Intel* Factor, the Court should consider whether LAE is seeking to

circumvent foreign discovery limits by petitioning for  discovery under Section 1782.  Courts

find such circumvention where, for instance, granting the request "would render [the foreign]

proceedings meaningless and undermine [the foreign tribunal's] rules on confidentiality."  *In re

Microsoft Corp.*, 428 F. Supp. 2d 188, 195 (S.D.N.Y. 2006).  There is, however, no such

circumvention where the request "reflect[s] a reasonable effort to overcome a technical discovery

limitation" or simply seeks to obtain evidence beyond the reach of the foreign tribunal.  *In re

Imanagement Servs., Ltd.*, No. MISC 0589FB, 2005 WL 1959702, at *5 (E.D.N.Y. Aug. 16,

2005); *see also In re Bayer*, 146 F.3d 188, 195 (3d Cir. 1998) ("The comity concerns we

expressed against use of U.S. discovery procedures to evade the limitations placed on domestic

pre-trial disclosure by foreign tribunals are applicable only when the *substance* of the discovery

is objectionable") (internal quotations omitted) (emphasis added).  Moreover, litigants are not

required to seek discovery through the foreign tribunal prior to seeking it from the district court.

*Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1098 (2d. Cir. 1995) (courts refuse "to engraft

a 'quasi-exhaustion requirement' onto section 1782 that would force litigants to seek information

through the foreign or international tribunal before requesting discovery from the district court")

(citation omitted).  The fact that an applicant seeks documents it could not obtain directly in the

foreign proceeding is not viewed as a "negative discretionary factor."  *In re Gemeinschaftspraxis*

*Dr. Med. Schottdorf*, No. M19-88 (BSJ), 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006)

("To be sure, Schottdorf's § 1782 application is a last resort to acquire discovery that it was

unable to obtain abroad.  But that is not an 'impermissible' use of § 1782 because, in some

respects, that is precisely the type of assistance that the statute was designed to afford.").

      As set forth in the Wu Declaration, this application is not an attempt to circumvent Hong

Kong discovery limits by a Hong Kong court and LAE does not seek evidence that would be

prohibited from disclosure in the Hong Kong Actions.  Wu Decl. ¶ 11; *In re California State*

*Teachers' Ret. Sys.*, No. CV 16-4251 (SRC), 2017 WL 1246349, at *3 (D.N.J. Apr. 3, 2017)

(granting application where "there is no indication that a request under § 1782 circumvents any

German policy on discovery").  On the contrary, Courts routinely find that the third *Intel* Factor

favors discovery where the discovery sought in the U.S. could not be procured directly by the

foreign court.  *In re Oxus Gold PLC*, No. MISC 06-82-GEB, 2007 WL 1037387, at *8 (D.N.J.

Apr. 2, 2007) ("[T]his Circuit has held that Section 1782 does not include a foreign admissibility

requirement[.]").  That is precisely the case here.  As set forth in the Wu Declaration, Mr.

Demuren does not reside in Hong Kong, and the Hong Kong courts do not have jurisdiction over

Mr. Demuren.  And even if the Hong Kong courts did have jurisdiction over Mr. Demuren, they would be unlikely to compel Mr. Demuren to produce documents or give testimony in the Hong Kong Actions. Wu Decl. ¶ 9.  The uses for which LAE seeks to obtain discovery from Mr. Demuren are to support its claims and defenses in the Hong Kong Actions and to avoid parallel (and likely futile) efforts to obtain that evidence in Hong Kong, permissible uses per Section 1782.

Finally, under the fourth *Intel* Factor, the Court should examine whether the requested discovery is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265.  The "assessment of the fourth factor is virtually identical to the familiar 'overly burdensome' analysis that is integral to the Federal Rules." *In re Cal. State Teachers' Ret. Sys.*, 2017 WL 1246349, at *4 (D.N.J. Apr. 3, 2017) (allowing Section 1782 application in aid of German case against Volkswagen A/G); *In re Ex Parte Glob. Energy Horizons Corp.*, 647 F. App'x 83, 86 (3d Cir. 2016).  In assessing this factor, courts look to whether the discovery requests are "sufficiently tailored to the litigation issues for which production is sought." *In re Gemeinschaftspraxis*, 2006 WL 3844464, at *8; *see also Fleischmann*, 466 F. Supp. 2d 1020, 1033 (N.D. Ill. 2010) (finding materials sought were relevant to claims and defenses and could be collected without undue burden); *In re Minatec Finance S.A.R.L.*, No. 1:08-CV-169 (LEK/RFT), 2008 WL 3884374, at *3 (N.D.N.Y. Aug. 18 2008) (requests for materials under Section 1782 not unduly intrusive or burdensome as they were "specifically and narrowly tailored to both [relevant] issues – tax liability and mislabeling"); *In re Chevron Corp*., No. 7:10-MC-00067, 2010 WL 4883111, at *4 (W.D. Va. Nov. 24, 2010) (finding that application was "entirely reasonable" given that the discovery "could possibly contribute to Chevron's incurring hundreds of millions of dollars in liability" notwithstanding that Chevron had filed multiple § 1782 applications against respondents that

respondents asserted were "merely an attempt to drain their resources"); *Chevron Corp. v. Snaider*, 78 F. Supp. 3d 1327, 1342 (D. Colo. 2015) (documents sought through Section 1782 were crucial to determining the knowledge held by funders of the foreign lawsuits regarding alleged racketeering activity).

Here, LAE's request for deposition testimony of Mr. Demuren and for relevant documents are narrowly tailored to probe facts and discover information that are squarely at issue in the Hong Kong Actions—a dispute over a contract worth $100 million.  As set forth in the Subpoena, LAE is requesting Mr. Demuren's deposition testimony and the production of: (1) documents and communications concerning the disputed agreements with LAE; (2) documents submitted by RemX to certain identified U.S. financial institutions, including Binance US, Citibank N.A. NY, and Fedwire, in connection with compliance-related reviews; (3) documents concerning RemX's alleged uses of dummy agreements, Same Company Funds Transfers and other practices it claims to leverage to evade AML and KYC scrutiny; and (4) documents pertaining to RemX's relationship with Binance US and purported needs for LAE's bitcoin services.

Each category of documents is plainly relevant to LAE's claims and defenses in the Hong Kong Actions.  First, LAE's request for documents and communications concerning the disputed agreements is plainly relevant to RemX's claims that the OTC was intended to be the only operable agreement and that the VAR was never intended to be enforceable.  Second, LAE's request for documents RemX submitted to U.S. financial institutions in connection with those institutions' due diligence procedures is relevant to RemX's claims that LAE unreasonably imposed undue KYC and AML due diligence requirements in an attempt to scuttle the OTC. Third, evidence relating to RemX's use of dummy agreements and/or Same Company Funds

Transfers is relevant to RemX's claim that it routinely employs such devices and that the VAR under which LAE has sued is an example of such a device.  Finally, evidence relating to RemX's relationship with Binance US is relevant to RemX's reasons for transacting with LAE for an alternative means of purchasing bitcoin and to the appropriateness of LAE's due diligence into RemX's bitcoin-related business and clients.  These requests, which LAE seeks to serve to obtain evidence to support its defenses and its claims for damages in the amount of $88 million, do not impose any undue burden on Mr. Demuren, a principal of RemX and key witness to the facts at issue in the Hong Kong Actions.[3]

## CONCLUSION

For the foregoing reasons, LAE respectfully requests that the Court grant its application pursuant to 28 U.S.C. § 1782 1782 and issue an order permitting LAE to serve the requested subpoena on Mr. Demuren.

---

[3] To the extent the Court finds that there is any undue burden in the requests, the Court may—in its discretion—modify the scope of the Subpoena accordingly (rather than reject the petition outright).  *See, e.g.*, *In re Blue Oil Trading Ltd.*, No. 09-MC-153, 2009 WL 3353293, at *2 (W.D.N.C. Oct. 15, 2009) (granting Section 1782 discovery but tailoring materials requested to address burden concerns); *In re Guy*, No. M 19-96, 2004 WL 1857580, at *3–4 (S.D.N.Y. Aug. 19, 2004) (modifying information requested via Section 1782 application).  LAE respectfully submits that such modification is not necessary here given the nature of the claims and defenses in the Hong Kong Actions and the narrowly tailored requests in the Subpoena.

**Dated:**      New York, New York
                  April 26, 2023

                                        Respectfully submitted,

                                        ARNOLD & PORTER KAYE SCHOLER LLP

                                        By:  */s/ Debra E. Schreck*
                                        Debra E. Schreck (NJ ID 042122006)
                                        ARNOLD & PORTER KAYE SCHOLER LLP
                                        250 West 55th Street
                                        New York, NY  10019-9710
                                        (212) 836-8000
                                        debra.schreck@arnoldporter.com

                                        *Attorneys for Applicant*
                                        *LAE Technologies Hong Kong Ltd.*

*Of Counsel*:

Marcus A. Asner*
Benjamin Wolverton*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY  10019-9710
(212) 836-8000
marcus.asner@arnoldporter.com
benjamin.wolverton@arnoldporter.com

*Not admitted in D.N.J.  Motions for *pro hac vice* to be filed.

20